**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANTHONY MARC MORA,
          *Plaintiff-Appellant,*

v.

THE CITY OF GAITHERSBURG,
MARYLAND; MARY ANN VIVERETTE,
Chief, Gaithersburg City Police;
CHRIS BONVILLAIN, Lieutenant,
Gaithersburg City Police; R. N.
ELLIOTT, Lieutenant, Gaithersburg
City Police; PATRICK A. WORD,
Detective, ID #7762, Gaithersburg
City Police; RAYMOND K. CAMPBELL,
Officer, Gaithersburg City Police; P.
VOIT, Officer, Montgomery County
Police Department; JAMES STADTLER,
PO I, ID #9442, Montgomery
County Police Department; KEN
ELSTON, PO III, Montgomery
County Police Department; ROBERT
UTTER, Corporal, Montgomery
County Police Department; EATON,
Officer, Montgomery County Police
Department; S. SCARFF, Sergeant,
Montgomery County Police
Department; JOHN DOE-I, Officer,
Montgomery County Police
Department; JOHN DOE-II, Officer,
Montgomery County Police
Department; JOHN DOE-III, Officer,
Gaithersburg City Police;

No. 06-2158

JOHN DOE-IV, Officer, Gaithersburg
City Police; JOHN DOE-V, Deputy,
Montgomery County Sheriff's
Department; JOHN DOE-VI, Deputy,
Montgomery County Sheriff's
Department,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(8:05-cv-01993-PJM)

Argued: December 6, 2007

Decided: March 4, 2008

Before WILKINSON and SHEDD, Circuit Judges, and
James P. JONES, Chief United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed as modified by published opinion. Judge Wilkinson wrote
the opinion, in which Judge Shedd and Judge Jones joined.

**COUNSEL**

**ARGUED:** Howard J. Fezell, Frederick, Maryland, for Appellant.
Victoria Marie Shearer, KARPINSKI, COLARESI & KARP, P.A.,
Baltimore, Maryland; Sharon Veronica Burrell, COUNTY ATTOR-
NEY'S OFFICE, Rockville, Maryland, for Appellees. **ON BRIEF:**
Richard T. Colaresi, KARPINSKI, COLARESI & KARP, P.A., Balti-
more, Maryland, for City of Gaithersburg Appellees; Marc P. Hansen,
Acting County Attorney, Patricia P. Via, Chief, Division of Litiga-

tion, COUNTY ATTORNEY'S OFFICE, Rockville, Maryland, for Appellee Officer James Stadtler.

---

**OPINION**

WILKINSON, Circuit Judge:

At Columbine High School in Littleton, in Blacksburg, Omaha, and Oklahoma City, America has had to learn how many victims the violence of just one or two outcasts can claim. These new predators are not terrorists in the ordinary sense; they are not linked to foreign powers or international organizations hostile to the United States. They are often isolated but heavily armed, filled to the brim with rage and anguish, and bent not just on murder, but on indiscriminate slaughter followed, frequently, by suicide. Violent derangement is nothing new, of course, but the atrocities seem to be growing at once more shocking and more commonplace.

This case presents the question of what emergency preventive action police may take, consistent with the Fourth and Fourteenth Amendments, when they learn of an individual who may well intend a similar slaughter, but who has neither committed nor attempted any crime. The legal issues are somewhat novel, and so we proceed with two values in mind: the need to prevent massacres whose human costs are beyond comprehension, and the need to preserve civil liberty for those who may be angry and depressed but not ultimately violent, and who cannot under our constitutional traditions be treated like criminals when they have committed no crime.

I.

At 1:02 P.M. on July 23, 2002, Maryland police received a call from a healthcare hotline operator. The operator said that she had just spoken to Anthony Mora, a local firefighter, who told her he was suicidal, had weapons in his apartment, could understand shooting people at work, and said, "I might as well die at work." By 1:03, multiple units were en route to Mora's apartment. By 1:04, police had called one of Mora's co-workers, who confirmed that Mora's threats should

be taken seriously; at some point, police also learned that Mora's girlfriend had recently ended her relationship with him. Police arrived to find Mora in the parking lot loading suitcases and gym bags into a van, and they approached with guns drawn. By 1:13, Mora was handcuffed and on the ground. No warrant had been sought.

At that point, police and Mora began talking, and police began searching — whether with consent or without is disputed. Police first searched Mora's luggage and van, finding one .32-caliber handgun round in a suitcase. Next, taking Mora's keys, they entered his apartment, where they found a large gun safe in the kitchen and every interior door (including bathroom and closets) locked. Mora relinquished the combination under pressure, and inside police discovered twelve handguns, eight rifles, one shotgun, and keys to a second safe. Opening the interior doors, the second safe, and a locked file cabinet, police found guns, ammunition, gun accessories, and what police called "survival literature" in every room but the bathroom.

At that point, two officers drove Mora to a hospital to see a psychiatrist. *See* Md. Code Ann., Health-General § 10-622(a) (LexisNexis 2005) (authorizing involuntary emergency psychiatric evaluation if an individual has a mental disorder and presents a threat to his own safety or that of others). The other officers re-entered the apartment to seize Mora's weapons. All told, they removed forty-one firearms — some apparently automatic, semi-automatic, or assault-style, and some loaded — as well as five-thousand rounds of ammunition, various accessories, and survivalist publications. The Gaithersburg police department took that property into custody. Again, no warrant had been sought.

We do not precisely know what the psychiatrist who saw Mora that day concluded, but Mora was not involuntarily committed, though he voluntarily admitted himself and stayed at the hospital for several days. There were also no criminal charges brought against him based on the day's events, then or at any other time. After his stay in the hospital, Mora returned home, where he discovered that his firearms and associated property were missing. Over the next few months, he moved to Pennsylvania. Meantime, the Gaithersburg police completed their investigation (which showed that Mora was a licensed gun collector and did not have a disqualifying criminal conviction)

and closed the case administratively, storing the seized property in their evidence room.

In 2003, through counsel, Mora inquired about getting his property returned, and Gaithersburg police did eventually return the accessories and survival literature — but not the guns and ammunition. Before getting those back, police told Mora, he would need to fill out their "Application for the Return of Firearms," which states: "The purpose of this Application is to determine if the Gaithersburg Police Department can *lawfully* return the firearm(s) to the Applicant, *and* if the Applicant can *lawfully* possess the firearm(s) . . . ." Mora, apparently taking exception to the form's questions about mental health (e.g., "Do you suffer from any mental illness?") and alcohol use (e.g., "How often do you consume alcoholic beverages?"), refused to fill it out. The police in turn refused to return the weapons.

Two more years went by. Then in 2005, Mora again contacted the Gaithersburg police through counsel, this time demanding the return of his property. He still refused to fill out the Gaithersburg firearms application, but he submitted all of the information required for Maryland state's firearms application, arguing that the state's preemption rules barred the city from insisting on questions additional to those imposed by state law. *See* Md. Code Ann., Criminal Law § 4-209(a) (LexisNexis 2002) ("[T]he State preempts the right of a . . . municipal corporation . . . to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of a handgun, rifle, or shotgun . . . ."); Md. Code Ann., Public Safety §§ 5-104, -133(a), -134(a) (LexisNexis 2003) (same). The differences between the Gaithersburg and Maryland questions are subtle ones, but were enough to become a bone of contention: Gaithersburg asked, for example, whether an applicant has "any mental illness" or "currently attend[s] Alcoholics Anonymous," while the state asked whether one has spent "more than 30 consecutive days in a medical institution for treatment of a mental disorder," or qualifies as a (statutorily defined) "habitual drunkard." *See* Md. Code Ann., Public Safety § 5-118(b) (LexisNexis 2003). The Gaithersburg police continued to insist on an investigation based on answers to the questions in their form.

In July 2005, Mora filed suit in Maryland federal court, naming as defendants the city of Gaithersburg, the Gaithersburg Chief of Police,

and various other individual officers. Notably, the complaint did not challenge the seizure of Mora's person. Instead, invoking 42 U.S.C. § 1983, it alleged that the searches of Mora's luggage, van, and apartment violated the Fourth Amendment; that the initial seizures of his property violated the Fourth Amendment; and that the continued retention of his weapons violated the Due Process Clause of the Fourteenth Amendment. The complaint also included state law claims for trespass to chattels and trover and conversion. It closed by demanding, along with damages, an injunction ordering the weapons returned. Defendants moved for summary judgment.

The district court ruled in two stages. First, at a hearing in January 2006, the court took up Mora's Fourth Amendment claims. The court emphasized at the outset that the police presence at the scene and seizure of Mora's person was indisputably proper — a point that deserved stress, in the court's view, "because much of what follows flows from that salient, primary fact." The court then held the searches of Mora's luggage and van to be incident to a lawful arrest or seizure, and the search of his home to be justified by exigent circumstances (chiefly the possibility of a bomb in the apartment). Thus the searches — and, the court mentioned in passing, the initial seizure of property too — were constitutionally reasonable, and even if they were not "it hardly needs to be said that . . . there would be qualified immunity."

The court then addressed the City of Gaithersburg's authority to retain the weapons. *See Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675 (D. Md. 2006). First, it took up Mora's argument that the firearms-related questions he found so objectionable on Gaithersburg's form were improperly asked because preempted by state law — holding, after examining state law at length, that the questions were indeed preempted. But even so, a "violation of state law, without more, does not amount to a due process violation." *Id.* at 693. To the extent Mora's claim sounded in procedural due process, the court reasoned, the availability of Maryland's state courts (of which Mora had never availed himself) barred a federal § 1983 suit for denial of process. And on the substantive side, the retention of Mora's firearms, even if erroneous, was not so arbitrary as to violate the substantive dimensions of due process — especially, again, with the state courts available to correct the error. Finally, the court held that Gaithersburg

and its Chief of Police had immunity under Maryland state law from Mora's claims for trespass to chattels and trover and conversion. Mora timely appealed.

## II.

The officers who seized Mora and his weapons were engaged in a preventive action aimed at incapacitating an individual they had reason to believe intended a crime. Preventive actions raise somewhat different constitutional questions than the typical backwards-looking criminal investigation or immediate police response to a crime already in motion. When the crime is as extreme and the need to prevent it as great as with potential mass murder, the constitutional questions take on special urgency and a certain novelty. We therefore pause to consider general principles of law in this area.

## A.

The Fourth Amendment and Due Process Clause are citizens' chief constitutional protections against police excess. But the Amendments are not rigid; they protect by insisting on judicial oversight, not by pressing inflexible rules. Thus, although the Due Process Clause typically requires a criminal conviction before a person may be deprived of liberty, the requirement is not a "categorical imperative." *United States v. Salerno*, 481 U.S. 739, 748 (1987). In certain circumstances, a pragmatic concern for public safety permits detaining, without criminal conviction, the mentally ill, *Addington v. Texas*, 441 U.S. 418 (1979); dangerous suspects awaiting trial, *Schall v. Martin*, 467 U.S. 253 (1984) (juveniles), *Salerno*, 481 U.S. 739 (adults); recidivist sex offenders, *Kansas v. Hendricks*, 521 U.S. 346 (1997); and enemy combatants, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004).

Likewise, the Fourth Amendment favors a warrant based on probable cause, but "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions," *Brigham City v. Stuart*, 126 S. Ct. 1943, 1947 (2006) — as when exigent circumstances justify the warrantless search of a home, *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978), or when the need for on-the-spot response justifies a search and seizure based on reasonable suspicion, *Terry v. Ohio*, 392 U.S. 1 (1968). The lesson of

these cases is clear: We are to approach the Fourth Amendment and the Due Process Clause with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way.

Our task, then, is to develop a framework for analyzing the constitutionality of preventive action. We need not start from square one; leading Fourth and Fourteenth Amendment precedents suggest a way. Indeed, the Court has addressed the issue of preventive action itself in *Terry*, where a policeman stopped and frisked several men without a warrant after watching them repeatedly pace in front of and peer into a store. To the officer's eye, the men seemed to be casing the store for a robbery, but at that point they had neither committed nor attempted any crime; the question before the Court was whether a stop-and-frisk was permissible to head off the crime. In answering, the Court applied "the Fourth Amendment's general proscription against unreasonable searches and seizures" and stressed that "there is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails." *Id.* at 20-21 (quotation omitted). Thus the Court focused first on "the governmental interest which allegedly justifies official intrusion" (the interest in "effective crime prevention and detection") and second on "the nature and quality of the intrusion on individual rights," both evaluated "in light of the particular circumstances." *Id.* at 21-22, 24 (quotation omitted). The Court ultimately approved the search and seizure, of course, preventive though it was.

This approach — identifying the individual and governmental interests at stake and balancing them for reasonableness in light of the circumstances — has become part of the landscape in Fourth and Fourteenth Amendment cases, and indeed in constitutional adjudication generally. *See, e.g.*, *Hudson v. Michigan*, 126 S. Ct. 2159, 2165-68 (2006) (taking a balancing approach under the Fourth Amendment to the application of the exclusionary rule); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995) (same for school sports urinalysis tests); *Salerno*, 481 U.S. at 748-51 (1987) (taking a balancing approach under the Due Process Clause to liberty from civil confinement); *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (same for property interests in disability cases).

### B.

As in *Terry*, we turn first to the government's interest. Protecting the physical security of its people is the first job of any government, and the threat of mass murder implicates that interest in the most compelling way. Police, then, simply must be entitled to take effective preventive action when evidence surfaces of an individual who intends slaughter. This is the lesson of a variety of recent school cases in which students have made Columbine-style threats, been suspended or expelled, and then sued — cases which have almost uniformly been decided in defendants' favor. *See, e.g.*, *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765 (5th Cir. 2007); *Boim v. Fulton County Sch. Dist.*, 494 F.3d 978 (11th Cir. 2007); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608 (5th Cir. 2004); *Williams v. Cambridge Bd. of Educ.*, 370 F.3d 630 (6th Cir. 2004); *Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616 (8th Cir. 2002) (en banc); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001). Concerns about violence and other threats to public safety have also motivated many of the Supreme Court's cases permitting confinement without conviction under the Due Process Clause, *see, e.g.*, *Hamdi*, 542 U.S. at 531, 580 (enemy combatants); *Hendricks*, 521 U.S. at 357-58 (sex offenders); *Salerno*, 481 U.S. at 748-49 (dangerous adults held without bail); *Schall*, 467 U.S. at 264-65 (dangerous juveniles held without bail); *Addington*, 441 U.S. at 426 (the mentally unstable), and searches or seizures without a warrant or probable cause under the Fourth Amendment, *see, e.g.*, *Maryland v. Buie*, 494 U.S. 325, 333 (1990) (protective sweeps of a home); *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (protective automobile searches); *Terry*, 392 U.S. at 24 (protective personal searches); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967) (exigent circumstances). Respecting the rights of individuals has never required running a risk of mass death.

And yet the Constitution does not permit a gloves-off approach to the individual interests on which preventive action encroaches — typically liberty and privacy, and sometimes property — particularly because the conduct targeted in preventive action is necessarily non-criminal. There must be principles of constraint. *Terry* is again instructive: It insists, first, that preventive searches and seizures be objectively reasonable, 392 U.S. at 21-22; second, that the intrusion

be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *id.* at 21; and, third, that the scope of the intrusion be "strictly tied to and justified by the circumstances which rendered its initiation permissible," *id.* at 19 (quotation omitted). To be sure, *Terry* involved a somewhat different type of preventive action ("predicated upon the on-the-spot observations of the officer on the beat," *id.* at 20) than the one at issue here. But these three principles apply in both contexts. And similar principles of constraint are present in even relatively permissive rulings governing police action. *See, e.g.*, *Buie*, 494 U.S. at 334-36 (requiring that protective sweeps of homes be brief, limited in scope, and based on "articulable facts" indicating that a dangerous third party might be present); *Salerno*, 481 U.S. at 751 (requiring "clear and convincing evidence" of future dangerousness to justify pretrial detention). These principles are a part of our constitutional tradition.

Given the recurring tension between governmental and individual interests in the preventive action context, the question becomes what tips the balance in a particular case. The relevant "specific and articulable" facts in *Terry* were those that tended to show the *likelihood* that a crime would come to pass — namely the suspicious pacing about and peering into the target store. The likelihood or probability that a crime will come to pass plays a role in other prevention-oriented cases as well. *See, e.g.*, *Hendricks*, 521 U.S. at 360 ("Hendricks even admitted that, when he becomes 'stressed out,' he cannot 'control the urge' to molest children."). But so do two other factors. The first is how quickly the threatened crime might take place — for as the doctrine of exigent circumstances has long held, "a plausible claim of specially pressing or urgent law enforcement need" can justify a warrantless search or seizure. *Illinois v. McArthur*, 531 U.S. 326, 331 (2001). The second is the gravity of the potential crime; even in limiting the police power to set up roadblocks, for example, the Supreme Court has recognized that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000). The principle, then, is this: As the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action. In circumstances that suggest a

grave threat and true emergency, law enforcement is entitled to take whatever preventive action is needed to defuse it.

Thus the proper application of a balancing test in preventive action cases respects the room for judgment that law enforcement must enjoy in any emergency where lives are on the line. The balance is struck with due deference for the difference in perspective between an officer who must make snap judgments in minutes or seconds, and a judge who has "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). And whether the officers' actions are later reviewed as a matter of the Fourth Amendment merits or on a defense of qualified immunity, we ask only for objective reasonableness — "objective" because we do not try to read an officer's mind, and "reasonableness" because the term itself implies, above all, real respect for those charged with the front-line protection of human life.

The chief strength of balancing tests is that they are attuned to individual circumstances. Their chief weakness is uncertainty of guidance. The inevitable imprecision in any balancing equation, however, should not lead to a regime in which officers necessarily face no liability for failing to act, *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989), but who, upon acting, are subjected to the most exacting scrutiny (potentially for damages under 42 U.S.C. § 1983) — a regime of inverted incentives that would "inhibit officials in the discharge of their duties," *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). For the public interest is "not served by a police force intent on escaping liability to the cumulative detriment of those duties which communities depend upon such officers to perform." *Gooden v. Howard County*, 954 F.2d 960, 967 (4th Cir. 1992) (en banc). Inaction, no less than action, has its costs — a failure of response where one is called for permits the blasts of the gunman to shatter those connections that human beings hold most dear.

### III.

We now apply these principles to Mora's three major arguments: that the police searches of his luggage, van, and apartment violated his Fourth Amendment rights; that the initial seizures of his guns, ammunition, firearms accessories, and survival literature violated his Fourth Amendment rights; and that the retention of his guns and

ammunition violates his Fourteenth Amendment due process rights. In the background are qualified immunity questions, but we do not address them here — for the first step in any qualified immunity inquiry is to examine whether the plaintiff's rights were violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

A.

Mora argues that the officers, having handcuffed him and laid him face down on the ground, had accomplished the purpose for which they had come — subduing him — and had no business going on to search his luggage, van, and apartment without a warrant. The district court upheld the searches under two traditional exceptions to the warrant requirement, one for searches incident to a lawful arrest or seizure (which the court applied to the search of Mora's luggage and van), and the other for exigent circumstances (which the court applied to the more constitutionally sensitive search of Mora's home). But the first exception, Mora argues, is based on the risk that a suspect might reach into his car or bag for a weapon. *Chimel v. California*, 395 U.S. 752, 762-63 (1969). The second exists for emergencies in which speed is essential to prevent escape or harm to police or others. *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Neither applies, Mora argues, when he was so thoroughly under police control prior to the searches.

Our analysis begins with what the district court called the "salient, primary fact" in this case: the overwhelming justification police had for rushing immediately to Mora's home and taking him into custody. Mora's phone call to the hotline operator, as she reported it to the police, showed a man on the edge, a man who was armed, suicidal, and inclined to kill his co-workers on the way out. His last, chilling remark, "I might as well die at work," was ambiguous to be sure, but it intimates a massacre, and his co-worker confirmed that the threat was serious. The very concept of an emergency was made for this situation, and police responded in emergency mode, dispatching to Mora's home within one minute of the hotline operator's call and apprehending him the moment they arrived with guns drawn. Mora does not dispute the legality of this response, nor could he.

These facts implicate exactly the interests we discuss above, pitting the individual interest in privacy against an overwhelming govern-

mental need to respond to a credible and urgent threat of mass homicide. Balancing these interests, we noted earlier that officers in such situations may take those steps that are needed to defuse the threat. *See supra* Part II. Implicit in Mora's argument, however, is the assumption that the emergency he created came immediately to an end when he was handcuffed.

We do not agree. The authority to defuse a threat in an emergency necessarily includes the authority to conduct searches aimed at uncovering the threat's scope. When police arrived at Mora's apartment and handcuffed him, they did not and could not fully know the dimensions of the threat they faced. They knew only that they faced an emergency of the kind that has traditionally justified warrantless searches, even into a home. *See Mincey*, 437 U.S. at 392-94 (recognizing that warrantless entry into a home is permitted in exigent circumstances). As the district court emphasized, Mora might have had a bomb — not an unprecedented thing for men in his state of mind. Or as the commanding officer at the scene pointed out in his report, Mora might have taken hostage the girlfriend who, police knew, had recently broken up with him. Or Mora might have had a confederate. Even in the context of an ordinary criminal arrest, handcuffing a suspect outside his car does not eliminate officers' authority to search the passenger compartment for weapons or evidence. *Thornton v. United States*, 541 U.S. 615 (2004). As the Supreme Court has held, "[a] custodial arrest is fluid and the danger to the police officer flows from *the fact of the arrest*, and its attendant proximity, stress, and uncertainty." *Id.* at 621 (emphasis in original, quotation omitted). In an emergency situation presenting even greater "proximity, stress, and uncertainty," officers are entitled to find out what they are up against, and they often cannot find it out without conducting searches.

Searching Mora's bags, car, and home was thus part and parcel of defusing the threat he presented, and just as police had the authority to seize him without a warrant in the course of defusing that threat, so too could they conduct a warrantless search of his surroundings.

## B.

Mora next challenges the seizure of his guns, ammunition, firearms

accessories, and survival literature.[1] First, he questions whether there was any basis under the Fourth Amendment for taking property that was not contraband or evidence of a crime and that presented no immediate danger to the officers. Second, he argues that the Fourth Amendment's warrant requirement had surely taken hold by the time police took his property, for at that point he was already in a police cruiser en route to the hospital.

Again, we begin with the facts. The warning of a credible, life-and-death threat that led police to rush to Mora's home and search his apartment was corroborated by what they found: a home locked up from the inside like a fortress, with a gun safe in the kitchen holding twenty-one handguns, rifles, and shotguns. Unlocking the interior doors, the officers found weapons everywhere, including another twenty guns of the most deadly varieties (some loaded and ready for use), more than five-thousand rounds of ammunition, and various firearms accessories along with an assortment of magazines and videos described as "survival literature." An affidavit from the commanding officer at the scene states that "because of Mora's statements, the condition of the apartment, Mora's history of mental health issues, the presence of various survival literature, and the fact that Mora lived in a garden apartment and bullets could penetrate his neighbors' apartments, we believed that Mora possessed weapons that would render him capable of causing great harm to himself and the community" once he returned from the hospital, and thus "we decided to secure all weapons and ammunition for safekeeping to protect Mr. Mora and the public."

This public safety rationale was a sound basis for seizing Mora's weapons, whether or not they were contraband or evidence, for the authority to defuse the threat Mora presented comprehended the authority to take the weapons that made him so threatening. There are no shortage of precedents approving preventive seizures for the sake

---

[1]Mora's literature was returned, but he nonetheless argues on appeal that its seizure violated the First Amendment as well as the Fourth. The point was never argued before the district court or addressed by the district court, and we decline to address it here. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Wheatley v. Wicomico County, Md.*, 390 F.3d 328, 334 (4th Cir. 2004).

of public safety. *See, e.g.*, *Scott v. Harris*, 127 S. Ct. 1769 (2007) (permitting officers to protect bystanders by ramming into a fleeing driver's car); *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976) (permitting officers to protect drivers by towing vehicles that block roads); *Terry v. Ohio*, 392 U.S. 1 (1968) (permitting officers to protect potential victims of crime by seizing the potential criminal). And the commanding officer's decision to remove the weapons, made in the face of a situation rife with the potential for tragic consequences both to the public and to Mora himself, is not one that judges acting "with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight" should overturn. *Gooden v. Howard County*, 954 F.2d 960, 964-65 (4th Cir. 1992) (en banc); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989).

Mora argues that the public safety rationale cannot be accepted because he was a registered firearms collector with a lawful firearms collection. But lawful though the collection might have been, police were under no obligation to give it an innocent interpretation in light of the circumstances that led them to be at Mora's home in the first place. No more would they be required to overlook the chemistry equipment and extremist paraphernalia of someone who had threatened to make bombs.

Mora argues, however, that the whole public safety rationale is a "pretext" because Maryland's involuntary admission statute "did not permit a doctor to release him if he presented a danger to the life or safety of himself or others." *Brief of Appellant* at 12; *see also* Md. Code Ann., Health-General § 10-625 (LexisNexis 2005) (requiring involuntary admission if a patient has a mental disorder, is dangerous to himself or others, needs inpatient treatment, and refuses voluntary admission). This argument implies that once police transferred Mora to a psychiatrist, the responsibility for ensuring public safety passed to the psychiatrist as well; the officers could wash their hands of the situation, their job done. But protecting public safety is why police exist, and nothing in Maryland's involuntary admission statute supports the remarkable suggestion that, by handing Mora over to doctors, the officers relinquished authority over the thing for which they are under law chiefly responsible. A psychological evaluation would not change what the officers already knew: that Mora was unstable

and heavily armed, and a risk to himself and others. Indeed, had they not taken the weapons, and had Mora used those weapons to cause harm, the officers would have been subject to endless second-guessing and doubtless litigation as well, just as the officers and teachers at Columbine were challenged for red flags they had over-looked before that tragedy. *See Castaldo v. Stone*, 192 F. Supp. 2d 1124 (D. Colo. 2001).

The remaining question is whether, with Mora en route to the hospital, the officers should have gotten a warrant before seizing his property. While the dissipation of an emergency, even one as dire as this one, would dissolve the justification for preceding in the absence of a warrant, we are unwilling to say the emergency that brought on the seizure disappeared as quickly as Mora would have us think. The officers were entitled to take into account the nature of the threat that led to their presence at the scene, and the corroborating fact of a veritable fortress of weapons and ammunition they found when they arrived. Moreover, in the rapidly unfolding series of events, the officers could not be sure of exactly what it was they confronted. They had no way of knowing whether confederates might possess access to Mora's considerable store of firearms, or whether Mora himself might return to the apartment more quickly than expected and carry out some desperate plan. Further, it was unclear whether the weapons themselves might become evidence in a forthcoming prosecution, making the need to guard against their disappearance great.

Given these circumstances, to say the emergency vanished when Mora was heading to the hospital is to slice the situation too finely and employ hindsight too readily to actions aimed — as we cannot overemphasize — at heading off a human tragedy that, once visited, could not be redeemed or taken back.

## C.

Finally, Mora argues that the police's continued retention of his guns and ammunition violates his Fourteenth Amendment right not to be deprived of property without due process of law. He stresses that the weapons are not contraband or evidence; there is no question of his rightful ownership; and the police allege no crime that would forfeit his right to possess what he owns. Police can advance, Mora

argues, only one basis for their authority to retain the weapons: Mora's refusal to answer the questions on the Gaithersburg application for the return of firearms. The objectionable questions on that form, Mora insists, are not authorized by Maryland state law, which preempts local law on matters of firearms regulation. Mora has answered all the questions required under state law. Thus, he claims, the sole basis for retaining his property collapses, and he is entitled to an injunction ordering it returned.

We do not address the merits of this preemption argument — or any other argument concerning the Gaithersburg police department's authority to retain Mora's weapons. The premise that depriving someone of property without any legal authority to do so violates the Due Process Clause is unexceptionable. But it would be ill-advised if not impossible for us to decide whether the Gaithersburg police *are* without authority to retain Mora's weapons, because nestled in Mora's due process claim are two state law questions that we should not or cannot answer.

The first is whether Maryland firearms law really does preempt the questions on Gaithersburg's form. This issue is difficult not only because it tasks us with interpreting Maryland's preemption provisions (the sole focus for the district court), but also because it is not clear whether the questions to which Mora objects in fact conflict with Maryland law. Mora claims, for example, that Gaithersburg's question — "Do you suffer from any mental illness?" — goes beyond the closest equivalent question on Maryland's firearms application form, which asks if the applicant has spent "more than 30 consecutive days in a medical institution for treatment of a mental disorder." Md. Code Ann., Public Safety § 5-118(b)(vii) (LexisNexis 2003). The Gaithersburg question may be more demanding, but whether Maryland courts would regard it as preempted is for them to ascertain — particularly in light of Maryland's other legal provisions governing firearms and mental disability. *See id.* at § 5-122(a)(3) (requiring that a firearms application be rejected if the Secretary of State Police learns from a physician that the applicant "suffers from a mental disorder and is a danger"); §§ 5-133(b)(6), -134(b)(8) (requiring a physician's approval before anyone may transfer firearms to a person with "a mental disorder" and "a history of violent behavior," or before such a person may possess them).

The second state law question is still more important, and still more beyond our capacity to answer: When and if the disputed Gaithersburg questions are set aside, is Mora otherwise entitled to possess firearms under Maryland law? As noted, under Maryland's administrative regime governing firearms, someone interested in "purchas-[ing], rent[ing], or transfer[ring]" a firearm (which presumably applies to someone seeking the return of seized firearms) must fill out a form answering a number of factual questions — such as whether the person has been "convicted of a disqualifying crime," is "addicted to a controlled dangerous substance," or has "spent more than 30 days in a medical institution for treatment of a mental disorder." *Id.* at §§ 5-117, -118(b). But filling out the form is only the beginning. The form goes to the Secretary of State Police, who is permitted to approve it only after verifying the factual accuracy of the applicant's responses (say by checking police records). *See id.* at §§ 5-121, -122. The Secretary has other investigative responsibilities as well, and Maryland, as already discussed, has other legal requirements. *See id.* at §§ 5-133, -134.

Mora submitted answers to the form in the course of requesting that the Gaithersburg police return his weapons, but no entity — not the Secretary of State Police or a state court — has made factual findings as to whether his answers were truthful, and none has determined his overall compliance with Maryland law. Needless to say, as a federal appellate court, we cannot find the facts and, lacking them, should not make the legal judgments involved in resolving this issue. It is unthinkable that we would issue an injunction ordering Mora's firearms returned on due process grounds, as he requests, when we have no idea whether under Maryland law he is entitled to them.

The difficulty we would have in answering these two state law questions and addressing Mora's claim to his property on the merits points the way toward the core problem — a procedural problem — with his federal due process claim: Mora has not availed himself of Maryland's procedures for securing the return of his property. It is not clear whether Mora's claim sounds in procedural or substantive due process. But whichever way we take it, the availability of state procedures is fatal.

On the procedural side, the Supreme Court has held that "the existence of state remedies *is* relevant" for a § 1983 action based on procedural due process, for "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990) (emphasis in original). This should come as no surprise. Procedural due process is simply a guarantee of fair procedures, *id.* at 125 — typically notice and an opportunity to be heard, *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Mora has had, and continues to have, notice and an opportunity to be heard in Maryland, and he cannot plausibly claim that Maryland's procedures are unfair when he has not tried to avail himself of them. The state courts are open to him.[2] We have been given no reason to think the state process for redeeming his property rights, if those rights were violated, is constitutionally inadequate. Mora simply "found it unnecessary even to enter upon, let alone travel the entire length of, that road." *Amsden v. Moran*, 904 F.2d 748, 755 (1st Cir. 1990).

On the substantive due process side, Mora must show that the Gaithersburg police department's refusal to return his firearms is arbitrary, for "the touchstone of [substantive] due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quotation omitted). We have held that substantive due process violations "run only to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir. 1991). And therein lies the problem

---

[2]Besides his tort claims for trespass to chattels and conversion, Mora might invoke Maryland's statutory right to the return of property "rightfully taken under a search warrant" but "wrongfully withheld after there is no further need for retention of the property." Md. Code Ann., Criminal Procedure § 1-203(d)(1) (LexisNexis 2001). Although this provision technically applies only where property was taken under a warrant, it seems unlikely that a court would refuse to apply it to property rightfully taken and wrongfully withheld under an exception to the warrant requirement.

for Mora. Even setting aside the dubious claim that it is arbitrary to require someone like Mora to answer probing questions before returning forty-one guns and five-thousand rounds of ammunition, the fact is that any property deprivation he has faced is amenable to "rectification by . . . post-deprivation state remedies." *Id.* Thus Mora's substantive due process claim fails for much the same reason his procedural one did: Maryland's treatment of him is hardly arbitrary when the state has given him the means to correct the errors he alleges.

At the end of the day, Mora's due process argument sounds like a state law claim dressed up in due process clothing — like a wrongful death action brought to federal court as a § 1983 claim for deprivation of life without due process of law. Such suits are rarely favored, for the Fourteenth Amendment is not meant to be "a font of tort law." *Lewis*, 523 U.S. at 848 (quotation omitted). In our view, Mora's claim is basically one of conversion, trespass to chattels, or violation of Maryland's code of criminal procedure. Thus taking his claim as one of state law, we decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c) (2000) (permitting federal courts to decline supplemental jurisdiction when a state claim "raises a novel or complex issue of State law" or "substantially predominates" over federal claims); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[Supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's right.").

IV.

We have reviewed Mora's other federal claims and conclude they are without merit. As to all of Mora's federal claims, then, we affirm the dismissal with prejudice. To hold otherwise would be to cross the line between vindicating personal rights and punishing public officials for nothing more than doing their jobs. As to Mora's state claims, we modify the district court's judgment, dismissing without prejudice to Mora's ability to raise those state law claims in state court.

*AFFIRMED AS MODIFIED*