GREGORY, Circuit Judge,
concurring in part and dissenting in part:
Because I find that no exigency existed in the moments prior to the officers warrantless entrance into Apartment 407-A (“407-A”) and that there was not probable cause to search 407-A without the evidence secured during the warrantless search, I respectfully dissent as to Part III of the majority opinion and concur as to the remainder of the opinion.
I.
“[T]he Fourth Amendment favors a warrant based on probable cause, but because *273 the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions, as when exigent circumstances justify the warrantless search of a home.... ” Mora v. The City of Gaithersburg, MD, 519 F.3d 216, 222 (4th Cir.2008) (internal quotation marks and citations omitted). Indeed, “[i]t is well established that, even when officers have probable cause to believe that contraband is present in a home, a warrantless search of the home is unlawful unless exigent circumstances exist at the time of entry.” United States v. Mowatt, 513 F.3d 395, 399 (4th Cir.2008). The exigency exception applies when officers “have probable cause to believe that evidence of illegal activity is present and [ ] reasonably believe that evidence may be destroyed or removed before they could obtain a warrant,” United States v. Cephas, 254 F.3d 488, 494-95 (4th Cir.2001) or when “speed is essential to prevent escape or harm to police or others.” Mora, 519 F.3d at 226. I first turn to the issue of whether any exigency existed on the night in question.
In ascertaining whether a “reasonable officer” would have found that an urgency existed, we focus on the officers’ knowledge in the moments prior to commencing the search. The majority concedes that the intelligence available to the officers confirmed that Moses “d[id] not sell [drugs] out of his house and [that he] lives [in 407-A] by himself.” (J.A. 229.) Despite this lack of actionable intelligence, the majority concludes that the officers reasonably believed that exigent circumstances precluded them from waiting for a search warrant. The following four events, all of which occurred on July 17, 2006, the night of Moses’ arrest, convinced the majority that an exigency that clearly had not existed theretofore, suddenly manifested: (1) As police approached Moses’ vehicle, Moses was on the phone with his next door neighbor and cousin, Catressa Moore (“Moore”), (2) the “loud and unprovoked commotion” caused by Moore after multiple officers showed up at her doorstop asking to search her home, (3) the officers inability to see inside 407-A because Moses’ blinds were drawn, and (4) the presence of an unidentified gold vehicle parked in front of Moses’ apartment building.[1]
None of these facts, individually or collectively, transformed a controlled situation into one filled with exigency. With respect to Moses’ phone call, there is nothing peculiar about making contact with a family member upon being stopped by tbe police; in fact, this is a natural reaction to the jolting experience of being pulled over by multiple officers. Moses responded truthfully to all of Officer Thomas Kroh’s questions, providing him with the identity of the person he was speaking with on the phone, Moore, and giving the officer Moore’s correct address. Presumably, if Moses had called his cousin to solicit her aid in destroying contraband located in his apartment, Moses would have been far less forthcoming with this information.
The district court and majority also rely on the fact that the commotion caused by Moore in Apartment 407-B (“407-B”) may have alerted people in 407-A to the police presence. The majority’s description of Moore’s reaction to the officers as “loud and unprovoked” paints a distorted picture of what transpired at her apartment. As *274 Moore explained to the officers, she “hated” Moses, and thus, it is hardly surprising that she reacted in a volatile manner to the appearance of .multiple officers at her doorstep demanding consent to search her residence, ostensibly to confirm the existence of a passageway between Moore’s and Moses’ apartments. Despite her initial angst, Moore voluntarily allowed the officers to search her home, hardly the profile of someone trying to obfuscate the authorities’ investigation. Considering the officers’ finding that no passageway existed and Moore’s obvious distaste for Moses, the idea that Moore created a commotion to alert another person in 407-A to the presence of the police in order to help her cousin, lacks credence. Unlike the situation in United States v. Vasquez, 638 F.2d 507 (2d Cir.1980), where a suspected drug dealer mislead agents’ into believing that him and his cohorts had come out of a second floor apartment when in fact the relevant apartment was located on the fourth floor, Moore did not deceive the officers. In addition, in Vasquez, during the ensuing melee in the second floor apartment, the officers realized that they had been bamboozled after the landlord informed them that the culprits’ actually came out of an apartment on the fourth floor. Here, the: officers did not have information from a reliable' source (or any source for that matter) that a third party existed in 407-A.
The majority also relies on the fact that the officers could not see inside Moses’ apartment. Once again, there is nothing illegal or even unusual about a person “shut[ting] up” the windows of his home to protect his privacy. The billions of dollars in annual sales generated by the blinds industry provides sound evidence that Moses is not alone in his desire to protect his home from the prying eyes of the public. Furthermore, Officer Goodykoontz (“Goodykoontz”) had other information to rely on to dispel his hunch that another party was in 407-A. For example, despite standing in front of 407-A’s door, Goodykoontz heard no sounds from inside the apartment. Critically, the moments during which Goodykoontz stood at 407-A’s door listening for sounds overlapped with the time when Moore was allegedly creating a commotion next door. Thus, if a cohort of Moses was in 407-A, Moore’s outburst should have tipped off the occupant to the police presence and triggered the destruction of the contraband, a task that surely would have generated noise.
Finally, Goodykoontz stated during his cross-examination that “the gold ear parked in front [of Moses’ apartment]” (J.A. 73) was the reason for his suspicion that another person remained in Moses’ apartment. Yet, this excuse seems to be exactly that: an excuse. It is incredulous that the officers did not run the gold car’s license plates to identify its owner or in the alternative, at least query Moses and his cousin about who owned the gold car. Furthermore, the gold car was stationed in the parking lot of an apartment complex with a multitude of residents, not parked in front of a single family home’s private driveway. Consequently, the location of the car in front of Moses’ apartment does not lead to the inevitable (or even likely) conclusion that the owner of the gold car had any relationship with Moses. Indeed, Goodykoontz himself conceded that point when he admitted that “there was no evidence to show that somebody was actually in the apartment [after Moses and his girlfriend left].... ” (J.A. 78.)
Since the district court relied on our decision in United States v. Turner, 650 F.2d 526 (4th Cir.1981), a comparison of the facts in both eases is worthwhile. In Turner, an informant told the police he personally observed one of the defendants, Gregory Turner (“Turner”) selling drugs *275 from his apartment; that Turner possessed a certain amount of cocaine on the night in question (the informant had purchased cocaine from the defendant that very night); that Turner would be leaving the apartment with the cocaine and transferring it to another location; and most importantly, he confirmed that Turner had an accomplice with him in the apartment.
After receiving this information, the police began to prepare a search warrant affidavit. Prior to the approval of the search warrant, Turner left the apartment and the police arrested him 300 to 400 feet from his apartment. While no cocaine was found on Turner, he informed the officers that his accomplice remained in the apartment. At that stage, one of the police officers on the scene spoke with a state prosecutor who directed the officer to enter Turner’s apartment immediately to arrest Turner’s accomplice and prevent the possible destruction of the cocaine. The officer used Turner’s keys to enter the apartment without a warrant. Because the officers reasonably believed that Turner’s accomplice could have been aware of his arrest (due to the proximity of the arrest to the apartment) and possibly destroy the drugs prior to the delivery of the search warrant, we held that the exigent circumstances exception justified the officers’ warrantless search.
As with all cases involving exigent circumstances, “the emergency circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized.” Turner, 650 F.2d at 528 (internal quotation marks and citation omitted). Moses’ situation can be easily distinguished from the situation in Turner on several counts including: (1) in the moments prior to the officers’ warrantless entry into Moses’ apartment, there was no reliable information that anyone remained in 407-A; (2) an occupant in 407-A could not have seen Moses’ arrest; (3) no real-time eyewitness testimony existed to confirm that drugs existed in 407-A that night; and (4) Goodykoontz knocked on the door to 407-A while the other officers went to 407-B, and nobody answered; in addition, Goodykoontz failed to hear any audible sounds emanating from 407-A.
It is also noteworthy that after confirming that there was no access between 407-A and 407-B, the officers spent an indeterminate amount of time discussing their next move. During this time span, Goodykoontz asked Moses for consent to search 407-A, which he denied. According to Goodykoontz, at that point, he “took [Moses’] keys to ensure that he had some right to [4.07-A].” (J.A. 83) (emphasis added). After determining that Moses’ key fit the keyhole, thus confirming that Moses did have a right to 407-A, Goodykoontz and Kroh nevertheless proceeded into 407-A to conduct a warrantless “protective search” for the reasons stated above, though I find all of those reasons to be perplexing and wholly unconvincing. In addition, while Moses did have a violent criminal history, and Carl Kotay Graham (“Graham”), the head of Moses’ gang, told the police that Moses stashed guns in his home, Moses was secured in the back seat of a police car and posed no threat to any of the officers. If officers can simply enter a person’s domicile on the basis that the suspect has a violent criminal history, Fourth Amendment protections will no longer exist for the millions of American citizens who have a violent felony on their record.
Overall, we have held that five factors are relevant in determining whether exigent circumstances exist:
(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers’ reasonable belief that the contraband is about to be removed or destroyed; (3) the possibili *276 ty of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that police are on their trail; and (5) the ready destructibility of the contraband.
Turner, 650 F.2d at 528 (citation omitted). Based on the facts above, no urgency exited in 407-A on July 17, 2006. Indeed, the officers admittedly had no evidence that anyone remained in 407-A after Moses and his girlfriend departed.[2]
Second, while a reasonable officer could believe that contraband was present inside 407-A, for the reasons stated above, no reasonable officer could fathom that there was someone in 407-A destroying the contraband. Third, as to the possibility of danger to police guarding the site, contrary to the district court’s finding, the fact that the officers spent time prior to the arrest and after the search of 407-B without calling for any back-up indicates that they did not feel any significant danger. In addition, there were multiple police officers standing outside 407-A to secure the immediate area around the apartment. Goodykoontz himself clearly felt comfortable approaching 407-A on his own while the other officers went to 407-B, further demonstrating that the officers themselves, like any reasonable officer under those circumstances, did not fear for their safety. Fourth, given the opportunity to destroy contraband, it is reasonable to conclude that most parties would do so upon learning of a police presence; however, in this case, there is no evidence that any person with such an opportunity actually existed. Finally, while the drugs could have been destroyed without much effort, the destruction of the firearms would have been virtually impossible.
Ultimately, the facts relied upon by the district court and the majority relate, ostensibly, to the distinct possibility that a previously unidentified person remained in 407-A after Moses and his girlfriend left his apartment on July 17, 2006, thus justifying the officers’ warrantless entry. Looking at the facts known to the officers, both individually and cumulatively, I am left with a “definite and firm conviction” that the district court clearly erred in finding that reasonable officers could conclude that such a possibility existed. Turner, 650 F.2d at 528 (internal quotation marks and citation omitted).
II.
Having found that exigent circumstances did not exist, I briefly turn to the issue of whether there would still be probable cause to search 407-A if the information gained from the warrantless search was struck from the search warrant affidavit. After excising the information gained from the protective search of 407-A, the following information remains in the affidavit: “intelligence” conveyed by a second officer to Goodykoontz indicating that Moses used 407-A to store a “distributable amount of illegal narcotics and firearms”; a search of Moses after his arrest resulted in the discovery of four grams of marijuana in Moses’ pant pocket; Moses possessed the key for 407-A, although he denied any connection with 407-A; Moses’ criminal history, which included drug possession and concealed weapon charges; and Goodykoontz’s extensive investigative experience in the narcotics trade.
Probable cause does not mandate “absolute certainty,” United States v. Gary, 528 F.3d 324, 327 (4th Cir.2008), and exists if “a fair probability that contraband or evi *277 dence of a crime will be found in a particular place.” Id. (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). As to the intelligence, the affidavit does not contain any information as to the source of the intelligence, and as a result, the magistrate could not evaluate the reliability of the information.[3] This is critical to the probable cause determination because the most important background information on Moses came from this intelligence.
Second, the four grams of marijuana found on Moses is not a distributable amount, rather it is only sufficient for personal use. As such, without further information, this is not enough to suspect that Moses possessed a large quantity of narcotics in 407-A. With respect to Moses’ criminal history, the search warrant only provided the magistrate with information that Moses had been charged with several prior counts of drug possession and three concealed weapon charges, including possession of a firearm by a felon. While the affidavit makes it clear that Moses was a felon, the affidavit does not indicate on what charges Moses was convicted. Consequently, the magistrate would have had to assume that the charges against Moses resulted in guilty pleas or convictions in order to find such evidence persuasive. Thus, we are left with the fact that Moses failed to confirm his association with 407-A. While this factor is certainly relevant, it is not enough to establish a “fair probability” that Moses’ residence contained contraband. Consequently, I would hold that without the evidence garnered during the protective search of 407-A, the officers did not have probable cause to enter Moses’ apartment.
Since I would reverse the district court’s denial of Moses’ motion to suppress with respect to the warrantless search of 407-A, I respectfully dissent from Part III of the majority opinion, although I join my colleagues in the remainder of their opinion.

. In addition to the cell phone call and the commotion caused by Moore cited by the majority, the district court found that the proximity of Moses' traffic stop to 407-A and the intelligence indicating that Moses used 407-A as a stash house for drugs and guns, provided support for the officers' conclusion that an exigent situation had arisen. I will briefly address these additional reasons below.

. While the record confirms that Goodykoontz's surveillance of the Cedar Street Residence began at 2:45 p.m., and the warrant for 407-A issued at 5:40 p.m., there is no indication as to when Goodykoontz applied for the warrant.

. The record indicates that the intelligence came from Graham during an oral interview with an officer from the Greensboro Police Department. The search warrant stated that Goodykoontz “received information from Officer S. Richardson ____” that Moses was "dealing illegal narcotics and possessing firearms.” (J.A. 235.)