# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 14, 2014      Decided August 11, 2015

No. 13-7140

CARLA DOE, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01060)

———

*Mick G. Harrison* argued the cause and filed the briefs for appellants. *John M. Clifford* entered an appearance.

*Stacy L. Anderson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: GARLAND, *Chief Judge*, WILKINS, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* WILKINS.

RANDOLPH, *Senior Circuit Judge*: The District of Columbia's Child and Family Services Agency temporarily removed two adopted children from their home. These two children and another child living there had endured sexual abuse for years. The children resided with their parents, Robert and Carla Doe. After the government acted, the Does brought a multi-count complaint seeking damages from the District of Columbia, the Family Services Agency, and District employees. The district judge, Hogan, J., ruled against them on all claims. The Does appeal.

For the reasons that follow, we vacate the dismissal of the Does' Fourth and Fifth Amendment claims against the District. We remand those claims to the district court to determine whether there is municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). We affirm the district court on the remaining claims.

I.

The evidence developed in discovery tended to show the following. Robert and Carla Doe are the adoptive parents of Oliver and Ann and the biological parents of Emma.[1] Oliver (born 1995) and Ann (born 1997) became part of the family when they were infants. In 2000, twins Wayne and Sara joined the family. At the time, Emma was 10, the twins were 9, Oliver was 5, Ann 3. The Does finalized their adoption of the twins in 2001.

Before the twins came to the Does, Mrs. Doe knew that Wayne and Sara had not lived "in a stable home, were hungry

---

[1] The names of the parents and the children are pseudonyms. Much of the record, but not the parties' briefs and the district court's opinion, is sealed.

and homeless for some time, did not receive appropriate medical care, had a drug-abusing mother, had been in weekly therapy for years, and were put by their mother in inappropriate situations, unsafe and unhealthy environments for children, including drug environments." *Doe v. District of Columbia*, 958 F. Supp. 2d 178, 183 (D.D.C. 2013) (internal quotation marks and citation omitted). When the twins arrived, the Does began receiving monthly adoption stipends, funds for therapy from the Crime Victims' Compensation Fund, therapy services from a court clinic, and funds for a therapeutic summer camp for Wayne. *See id.* at 198.

The twins began sexually abusing Ann and Oliver shortly after they moved into the Doe household. *See id.* at 183. Four years later, in 2004, Carla and Robert Doe learned of the abuse. *See id.* On September 27th of that year, the Does wrote to Family Services Agency employees (Acting Director Brenda Donald Walker and Adoption Services Program Manager Sharon Knight) notifying them that the twins had been abusing Ann and Oliver "for years." The Does sought "emergency support to try and prevent the disruption of the adoption of two of [their] children" and requested "funding or other resources," because "[w]e have no funds of our own to even attempt to undertake what is necessary to determine if our family can be preserved." The Does reiterated that they had "fallen behind financially" and stated: "We are no longer able to continue parenting now four children with such significant needs." The Does' letter also stated that Wayne had moved to an "out-of-home, therapeutic respite home" with provider Deborah Bobbitt and that Sara remained at the Doe home. *See Doe*, 958 F. Supp. 2d at 183. On October 1, 2004, Robert met with defendant Sandra Jackson, the Administrator of Permanency and Family Resources Administration, several other Agency employees, and two therapists who had provided therapy to the Doe family. *See id.* Robert explained that Sara and Wayne "couldn't safely

reside in our home" and that he "had to have some other temporary place for them to reside while they were getting treatment."

Four days later, on October 5, the Agency received a follow-up letter from Robert. *See Doe*, 958 F. Supp. 2d at 183. In it, he reemphasized that if the Agency could not provide further financial assistance to support Wayne's out-of-home care, "immediate plans will need to be made to transition him into a new residential placement." By then, Sara had moved to Carla Doe's mother's home. *See Doe*, 958 F. Supp. 2d at 183. Carla Doe's mother, Robert wrote, would not be able to keep Sara "much longer" and "[a]s soon as possible this week, [Sara] needs to be transitioned into a residential placement."

On October 7, Agency officials, including Jackson and Agency General Counsel Terri Thompson Mallet, had a telephone conversation with Robert to discuss placement options for the twins. *Doe*, 958 F. Supp. 2d at 183-84. The officials said the Agency would cover the cost of therapeutic foster care but would not provide transportation or pay for Wayne's therapy with Bobbitt, since she was not an approved provider. *Id.* at 184.

On the same day, October 7, the Agency began an investigation. The investigator, Delores Williams, looked into the "sexual abuse allegations as it relate[d] to sibling on sibling, whether the adoptive parents failed to provide adequate supervision and if there was failure to protect by the adoptive parents." Williams spoke with Robert and Carla Doe and Ann and Oliver at their home on the evening of October 7. In a "safety decision" dated the same day, Williams reported that while "[o]ne or more signs of present danger were identified," the children were not "in immediate danger of serious harm," in light of "the existence of protective capacities [that] offset the

threat of serious harm for the children." She noted that Wayne had been placed in a therapeutic home in Virginia and that the Does had sent Sara to the grandmother's house. Williams also explained that, as part of Does' "safety plan," a portable monitoring system had been attached to the bedroom doors of the children who remained at home and that adult supervision had increased.

A day later, on October 8, Williams participated in an interview with Ann and Oliver at a child advocacy center. *See Doe*, 958 F. Supp. 2d at 184. During the interview, Ann and Oliver said they were both abused by Wayne and Sara, and, for the first time, Williams learned that Oliver participated in victimizing Ann. *Id.* At the time, Oliver was living in the Doe home with Ann.

On October 14, the Does sent another letter to the Agency. They raised several concerns about the Agency's offer to have them agree to place the twins temporarily in therapeutic foster care but not pay for Wayne's continued therapy with Bobbitt or the twins' transportation to and from therapy. *See id.* The Does criticized the Agency for not investigating the extent of the abuse the twins had endured with their birth mother and for placing them with an abusive foster family before they were placed with the Does. The Does also objected to keeping the twins together during a temporary placement. The Does proposed that the Agency pay for Sara to attend a private school in Virginia and for her therapy; pay for Wayne's therapy with Bobbitt; pay for both twins' transportation; and pay for family therapy. *See id.*

On October 19, after an internal meeting, the Agency called Robert and "informed him that they had safety concerns regarding Ann, Oliver, Sara, and Wayne and that he needed to cooperate in placing the children into voluntary care pending

further investigation." *See id.* In a follow-up call to Agency General Counsel Mallet, the Does' attorney proposed alternative plans for Ann and Oliver and a voluntary placement arrangement for the twins, and he told the Agency it needed a court order to remove the children. *See id.*

On October 20, 2004, Agency officials, specifically Agency Director Brenda Donald Walker, concluded that Ann and Oliver were in immediate danger and needed to be removed from the Doe home. *See id.*; *id.* at 188 n.7. The same day, the Does' attorney negotiated with the Agency about the placement of Oliver and Ann with the Agency. *See id.* at 184. The Does agreed that Agency social workers, not the police, would remove Ann and Oliver from the Doe home to temporary placements elsewhere. *See id.* at 185.[2] That evening – a school night – defendants Daphne King and Rebekah Philippart, both of whom were social workers, were assigned to pick up Ann and Oliver and notify the Does of a court hearing the next day; neither King nor Philippart had previously been involved in the case. *See id.* King and Philippart went to the Does' residence and, over the objections of Robert and Carla, removed Ann and Oliver. *See id.* They also provided the Does a notice of a hearing in District of Columbia Superior Family Court scheduled for October 21 to respond to unspecified child neglect allegations. *See id.* The notice stated that the children were

---

[2] The Does' amended complaint alleged that on October 19 and 20 they negotiated with the Agency but "negotiation broke down when [the Agency] insisted that Oliver be placed in an undisclosed foster home overnight"; that the Does' attorney advised the Agency that it would need "a court order to immediately remove any of" the children; and that "[u]nder duress and the threat of arrest, and after speaking with the children's therapists, Robert and Carla Doe reluctantly agreed to allow [the Agency] to remove Ann and Oliver on October 20, 2004 at 9 p.m." J.A. 59 ¶¶ 89-91.

seized pursuant to D.C. Code § 4-1301.07, which provides that if, in cases of alleged child neglect, "in the opinion of the Agency the available services or resources are insufficient to protect the child and there is insufficient time to petition for removal, the Agency shall request the police to remove the child." D.C. CODE § 4-1301.07.

Ann and Oliver were taken to a hospital for physical examinations, after which Ann was taken to the grandmother's home, and Oliver was taken to a temporary foster home. *See Doe*, 958 F. Supp. 2d at 185. Wayne remained at his placement in Virginia.[3]

The next day, on October 21, 2004, the District "no papered" the neglect charges against Robert and Carla Doe, declining to file a petition against them, and the hearing was canceled. *Id.* Oliver returned home later that day; Ann was not required to stay in her foster placement, and the Does agreed to a voluntary placement with the Agency for Sara. *Id.* at 185 & n.4. On October 22, 2004, the District issued an affidavit and request for custody order for Sara and Wayne and charged them with second degree child sex abuse against their younger siblings. *See* J.A. 146. They were later taken into custody and placed on probation and in therapeutic foster homes. *See Doe*, 958 F. Supp. 2d at 185-86. From roughly November 2005 to April 2007, the twins were under the care of the Department of Youth Rehabilitation Services. *Id.* at 186. In May 2007, the District closed its cases against the twins, and the Does relinquished parental rights to Wayne and Sara. *Id.*

---

[3] As noted, Sara had been staying at Carla's mother's home. She was transported by District officials to a temporary foster home as well, *Doe*, 958 F. Supp. 2d at 185, although she is not part of this suit, and we do not examine any claims regarding her.

In December 2007, Carla and Robert Doe and the children other than the twins filed a twenty-four-count amended complaint against the District of Columbia, the mayor and Agency employees Brenda Donald Walker, Sarah Maxwell, Sandra Jackson, Heather Stowe, Terri Thompson Mallet, Rebekah Philippart, and Daphne King. The Does alleged violations of District of Columbia law and the U.S. Constitution. After proceedings unnecessary to recount, the district court granted the District's motion for judgment on the pleadings and summary judgment, denied the Does' motion for summary judgment, and denied as moot the District's motion to strike portions of the record. *Doe*, 958 F. Supp. 2d at 206.

On appeal, the Does claim that the district court erred when it dismissed their Fourth Amendment, Fifth Amendment, and First Amendment claims, erred when it granted qualified immunity to the individual defendants, erred when it dismissed the Does' tort claims, and erred when it dismissed their claims for post-adoption services under *LaShawn A. v. Kelly*, 887 F. Supp. 297 (D.D.C. 1995), *aff'd sub nom.*, *La Shawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996) (per curiam) (unpublished).

## II.

### 1. Fourth Amendment and Fifth Amendment Claims

According to the Does, the District, and its officials, violated their Fourth Amendment and Fifth Amendment rights when they removed Ann and Oliver from the Does' home without court authorization. The Doe children were taken from their home by Agency employees. This was a seizure within the meaning of the Fourth Amendment. *See, e.g.*, *Tenenbaum v. Williams*, 193 F.3d 581, 593-94 (2d Cir. 1999). Under the Fourth Amendment a warrant or a pre-removal hearing is not required when the government acts in response to an

"exigency." *See Doe v. Kearney*, 329 F.3d 1286, 1293-95 & 1294 n.10 (11th Cir. 2003); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010-11 (7th Cir. 2000). Under the Fifth Amendment, before parents may be deprived of the custody "of their children without their consent, due process – ordinarily a court proceeding resulting in an order permitting removal – must be accorded to them." *Tenenbaum*, 193 F.3d at 593; *see also Stanley v. Illinois*, 405 U.S. 645, 649-51 (1972). However, "'extraordinary situations where some valid governmental interest is at stake,'" such as the health and welfare of children, may justify "'postponing the hearing until after the event.'" *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 848 (1977) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972)); *see Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997) (the state has a valid "interest in the health and welfare of its children").

The district court held that neither the individual defendants nor the District violated the Does' Fourth or Fifth Amendment rights because there were "exigent" circumstances that justified the warrantless seizure of the children without a pre-deprivation hearing. *See Doe*, 958 F. Supp. 2d at 188-93.

The parties agree that exigent circumstances excuse a seizure of endangered children without a warrant or a pre-removal hearing. Decisions of several circuits have used various formulations to determine whether exigent circumstances existed to justify such a seizure.

In some circuits, reasonable suspicion of past abuse can justify warrantless seizure of a child. This is a very low standard, and could allow for the removal of a child without court order based on a single suspected incident. *See Hatch v. Dep't for Children, Youth and Their Families*, 274 F.3d 12, 21 (1st Cir. 2001); *see also Berman v. Young*, 291 F.3d 976, 983-84

(7th Cir. 2002); *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997); *White by White v. Chambliss*, 112 F.3d 731, 736 (4th Cir. 1997); *Manzano v. S.D. Dep't of Social Servs.*, 60 F.3d 505, 511 (8th Cir. 1995). In other circuits, there must be reasonable suspicion of imminent abuse. These courts consider several factors, including whether abuse was ongoing and whether there was time to obtain a warrant. *See Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013); *Gates v. Tx. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 429 (5th Cir. 2008); *Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir. 2006) (citing *Gomes v. Wood*, 451 F.3d 1122, 1129 (10th Cir. 2006)); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 1999). In the Eleventh Circuit, the "reasonable suspicion" standard gives way to the higher "probable cause" standard, with consideration of many of the same factors. *Doe v. Kearney*, 329 F.3d at 1295. And in the Second Circuit, "it is unconstitutional for state officials to effect a child's removal on an 'emergency' basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety." *Tenenbaum*, 193 F.3d at 596.

We have not enunciated our own formulation and do not do so here because we do not reach the question whether exigent circumstances existed in this case.

### A. Individual Defendants

We address first the claims against the individual defendants. The district court held that the individual defendants were entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional

right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).

"To overcome a claim of qualified immunity, plaintiffs must show both [1] that an official 'violated a constitutional right' and [2] that 'the right was clearly established' at the time of the violation." *Johnson v. Gov't of the District of Columbia*, 734 F.3d 1194, 1201-02 (D.C. Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)). We may address either prong of the qualified immunity analysis first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or [ ]Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (internal quotation marks and citation omitted); *see also Reichle*, 132 S. Ct. at 2093. "To be clearly established, the precedent must give officials clear warning of unconstitutional conduct." *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015).

The parties do not dispute that in an exigency the state may, consistent with the Constitution, seize children without a court order or a pre-deprivation hearing. But the precise contours of when an exigency exists to justify removal without a warrant or pre-deprivation hearing are not settled, as the other Circuits' varied formulations demonstrate. Given the uncertainty regarding when exactly an exigency exists and the lack of our own controlling precedent, the law in question was not "clearly established" at the time of the seizure. The individual defendants are thus entitled to qualified immunity as the district court held. *See Pearson*, 555 U.S. at 244-45; *Johnson*, 734 F.3d at 1201-02.

B.  Municipal Liability

"A municipality or other local government may be liable under [42 U.S.C. § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell*, 436 U.S. at 692). "But, under § 1983, local governments are responsible only for 'their *own* illegal acts.'  They are not vicariously liable under § 1983 for their employees' actions." *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citation omitted)); *see also Singletary v. District of Columbia*, 766 F.3d 66, 72 (D.C. Cir. 2014); *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004).

To impose liability on a local government for the torts of an employee, a plaintiff must prove that "action pursuant to official municipal policy" caused his or her injury. *Monell*, 436 U.S. at 691.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359; *see Pembaur*, 475 U.S. at 480-81.

Under Supreme Court precedent, even if the seizure of the Doe children amounted to a constitutional violation, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985).  The Supreme Court has held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," *Pembaur*, 475 U.S. at 480.

To hold the District liable, the Does must show (1) a Constitutional violation, and (2) that the District was responsible for that violation. *See Collins v. City of Harker Heights, Tx.*, 503 U.S. 115, 120 (1992); *see also Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003). On the first prong, there is a serious constitutional question regarding whether an exigency existed here, and we do not reach it. On the second prong, if District policy allows for the warrantless removal of children when there is no bona fide emergency, then the District would be responsible for any constitutional violation that may have occurred here. But if the Doe children were not removed pursuant to a custom or policy of the District, then the § 1983 claim fails.

District Code allows for the warrantless removal of children only when there is such an emergency. *See* D.C. CODE § 16-2309(a)(3) ("A child may be taken into custody . . . by any employee of the Agency . . . when he or she has reasonable grounds to believe that the child is in immediate danger from his or her surroundings and that the removal of the child from his or her surroundings is necessary."); *id.* § 4-1301.07(a) ("If in the opinion of the Agency . . . there is insufficient time to petition for removal, the Agency shall request the police to remove the child pursuant to § 16-2309(a)(3) or (a)(4)."). The Does argue that the District violated this statute because the children were not in "immediate danger" at the time of their seizure. *See* Appellants' Br. at 23 (emphasis in original). Furthermore, they point to an Agency policy, "Procedure U: Removal and Placement," that states that "[w]hen the child is in immediate or imminent danger, the Investigations Worker *shall* consider a broad range of safety-oriented responses, including those that protect a child *without* taking custody of the child." J.A. 230 (emphasis added); *see* Appellants' Br. at 23-24. But a different District procedure in the record, Procedure V, seems to specify that the only time the Agency is required to obtain a court order

prior to removing a child from his or her home is when the Agency investigator "is unable to locate and/or remove the child whom he/she believes requires removal." J.A. 235.

On this record, we do not know if the District has a municipal policy, practice, or custom, *see Singletary*, 766 F.3d at 72-73 – regardless of the relevant statute – of seizing children absent an exigency. We also do not know the progeny, role, or relevance of Procedures U and V, whether these procedures allowed removal without a court order even in the absence of exigency, and if so, whether Procedures U and V are consistent with the applicable statutes. Further, we do not know whether Brenda Donald Walker, the Agency director who made the decision to remove the Doe children, relied on these procedures when she ordered the removal or was a final policymaker with the authority "to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481; *see also Singletary*, 766 F.3d at 73. The district court did not address these questions because it concluded its analysis when it found that an exigency existed. *See Doe*, 958 F. Supp. 2d at 190.

Because the constitutional question is a difficult one, and there is a question whether the District is liable under § 1983, the district court should address the question of municipal liability in the first instance. Similarly, because the D.C. Code appears to authorize taking a child into custody without a court order only if there are "reasonable grounds to believe that the child is in immediate danger," D.C. CODE § 16-2309(a)(3), and it is not clear if Procedures U and V are municipal "practices so persistent and widespread as to practically have the force of law," *Connick*, 131 S. Ct. at 1359, or if they were adopted in accordance with required notice-and-comment rulemaking, *see* D.C. CODE §§ 2-505(a), 4-1303.03(a-1)(12); *cf. Singletary*, 766 F.3d at 74, we remand to the district court the question of what relevance, if any, this policy has on the District's liability.

Accordingly, we vacate the grant of summary judgment on the Fourth and Fifth Amendment claims against the District and remand for the district court to determine whether municipal liability is permissible under *Monell*.

2. First Amendment Claim

To establish a claim for retaliation under the First Amendment, an individual must prove (1) that he engaged in protected conduct, (2) that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;" and (3) that there exists "a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011) (internal quotation marks and citation omitted); *see Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584-85 (D.C. Cir. 2002). "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Aref*, 774 F. Supp. 2d at 169 (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

Unlike the Fourth and Fifth Amendment analysis, the First Amendment retaliation inquiry is a subjective one. *See Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999).

The District concedes that the Does presented sufficient evidence to meet the first two elements of a First Amendment claim; only the third element remains in dispute. The Does contend that the District retaliated against them in violation of the First Amendment when it threatened to remove, and then removed the children on October 20, when it charged Robert and Carla with child abuse, when it initiated juvenile charges against the twins, when it discontinued services, and when it "forced"

the Does to relinquish parental rights over the twins.  *See* Appellants' Br. at 32.

It is indisputable from the record that the Agency's decision-makers, at the least, *thought* that there was a reasonable basis for believing that the Doe children were in imminent danger.  Although close temporal proximity between the plaintiff's protected action and the defendant's allegedly retaliatory action may be sufficient to allow a claim to survive summary judgment, *see Singletary*, 351 F.3d at 525, where, as here, there is substantial unrebutted evidence that the defendants acted with subjective good faith, summary judgment is appropriate on the First Amendment claims.

### 3.  Tort Claims

The district court granted summary judgment to the District on all of the Does' tort claims.  *See Doe*, 958 F. Supp. 2d at 194 n.13.  The Does appeal that ruling with respect to only four claims.

The Does alleged that all defendants assaulted and battered Ann and Oliver.  "An assault is an intentional attempt or threat to do physical harm to another.  A battery is an intentional act that causes harmful or offensive bodily contact." *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 913 (D.C. Cir. 2015).  As an initial matter, there is no evidence that any defendant other than Philippart and King, the social workers who removed Ann and Oliver, interacted with the children.  District law provides a government actor with a privilege defense to such tort claims when "(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable." *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (citations and alterations omitted); *see also Marshall v. District of Columbia*, 391 A.2d 1374, 1380-81 (D.C. 1978).

Given the social workers' good faith belief and the uncertainty surrounding what constitutes exigent circumstances – as discussed in our qualified immunity analysis above – the two social workers' actions were privileged. Nor do the Does claim the social workers employed excessive force. *See Arrington v. United States*, 473 F.3d 329, 335-36 (D.C. Cir. 2006). Thus, they are not entitled to relief on this claim.

Second, the Does claim the defendants invaded their privacy by entering into their home and personal lives in a manner not authorized by law. *See Wolf v. Regardie*, 553 A.2d 1213, 1216-17 (D.C. 1989). The defendants' duty to investigate claims of child abuse, their arrival – announced and coordinated with the Does' attorney hours earlier – and their subjective belief that the children were in immediate danger provided them with a good faith, reasonable belief that they acted lawfully in entering the Does' home. *See* D.C. CODE § 4-1301.04(a)-(b); *Pearson v. Dodd*, 410 F.2d 701, 704 (D.C. Cir. 1969). As with the assault and battery claims, the invasion of privacy claim therefore fails because the defendants' actions were privileged.

Third, the Does claim they suffered from intentional infliction of emotional distress. To make out a claim for intentional infliction of emotional distress, a "plaintiff must show that the defendant acted in an (1) extreme and outrageous manner (2) which was intentionally or recklessly calculated to cause plaintiff (3) severe emotional distress." *Joyce v. United States*, 795 F. Supp. 1, 5 (D.D.C. 1992), *aff'd*, 986 F.2d 546, (D.C. Cir. 1993) (per curiam) (unpublished). "Generally, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Harris*, 776 F.3d at 916 (alteration in original) (quoting *Abourezk v. N.Y. Airlines, Inc.*, 895 F.2d 1456, 1459 (D.C. Cir.

1990)). The Does describe the offending conduct as trying to disrupt their legal representation, advising the Does of possible police involvement, determining that the children were in imminent danger, referring neglect allegations to the prosecutor's office, prosecuting the twins, and declining post-adoption services. The Does' allegations hardly rise to the level of atrocious and utterly intolerable behavior. This conclusion is especially so here where the District was obliged to investigate serious reports of prolonged sexual abuse, *see* D.C. CODE § 4-1301.04(a)(1), and acted to protect children it believed, rightly or wrongly, were in imminent harm. A reasonable jury could not conclude otherwise.

Fourth, the Does claim that the defendants committed an abuse of process by maliciously planning and initiating a child abuse and neglect proceeding against Robert and Carla. "The essence of the tort of abuse of process is the use of the legal system 'to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do.'" *Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1996) (quoting *Bown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992)). "'For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 682 cmt. b (1977)). But something quite nearly the opposite is what occurred here. The legal system was employed to safeguard children who had been the victims of awful crimes. Aside from conclusory allegations that they were targeted in an otherwise reasonable investigation, the Does offer no proof that the legal system was used to accomplish anything but this worthy end.

For these reasons, we affirm the grant of summary judgment on all tort claims.

### 4. Post-Adoption Services

In the lengthy *LaShawn A.* litigation, a class action was brought against the mayor and District officials on behalf of children who depended on the District's child welfare and foster care systems. *See LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 86-87 (D.D.C. 2010), *aff'd sub nom.*, *LaShawn A. ex rel. Moore v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011) (per curiam) (unpublished). The district court found widespread problems in the child welfare system and finalized a consent decree to correct "myriad deficiencies" in it. *Id.* at 87. After an appeal, the district court entered a Modified Final Order ("MFO") based on District law and, in 2003, the court approved an implementation plan developed by a Court Monitor to bring the District into compliance with the MFO. *Id.* at 87-88.

The Does argue that the District "failed to properly respond" to their "post-adoption needs" as required by *LaShawn A.*'s MFO. J.A. 81 ¶ 214. In particular, they claim the District is liable for not providing suitable residential and foster family placements for the twins, appropriate therapy to the family, and transportation assistance, among other services.

As the district judge – who is the judge who issued the *LaShawn A.* MFO – held, 958 F. Supp. 2d at 203, the central problem with the Does' theory is their failure to show that they are among the intended beneficiaries of the *LaShawn A.* consent decree. "Third parties to a consent decree, involving the government or not, must demonstrate that they are intended beneficiaries in order to have enforcement rights . . .." *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 159 (D.C. Cir. 1998). The Does' theory seems to be that "if the parties to the consent

decree had any intent to benefit that third party," *see id.*—in this case, adopted children—then they are an "intended beneficiary," but that is not the case. *See also* RESTATEMENT (SECOND) OF CONTRACTS § 302(1). "To the contrary: a third party to a consent decree is not an 'intended beneficiary' unless the parties 'intended that a third party should receive a benefit which might be enforced in the courts.'" *Prudential Sec.*, 136 F.3d at 159 (emphasis removed) (quoting *Corrugated Paper Prods. v. Longview Fibre Co.*, 868 F.2d 908, 911 (7th Cir. 1989)). "The test is not, as appellants appear to suggest, only whether the contracting parties intended to confer a benefit directly on the third parties, but also whether the parties intended the third party to be able to sue to protect that benefit." *Id.*; *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975).[4]

The Does have not shown that they can sue to protect such a benefit. They point to the phrase from the MFO that "[a]ll provisions of the Implementation Plan . . . shall be enforceable by the court," Appellants' Br. at 45. But the Does do not show how the Order expresses any intent to provide them with enforcement rights. *See Terrell v. District of Columbia*, 703 F. Supp. 2d 17, 21 (D.D.C. 2010). Accordingly, we affirm the district court's grant of summary judgment on this claim.

## III.

For these reasons, we vacate the grant of summary judgment on the Fourth and Fifth Amendment claims against the District and remand for further proceedings consistent with this

---

[4] For support, the Does cite *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280 (D.C. Cir. 1993). We there held that third parties to a consent decree could sue to enforce its terms. But in that case the consent decree established a trust and named the plaintiffs as beneficiaries. *See id.* at 286-89. That is not the situation here.

opinion.  We affirm the judgment of the district court on the remaining claims.

*So ordered.*

WILKINS, *Circuit Judge*, concurring:

Because I agree that the *Monell* issue may be dispositive and that we do not have a sufficient record to rule on it, I join the Court's opinion. I write separately to highlight a troubling aspect of the approach taken by some courts when considering the constitutional issues raised when the state removes a child from her parents.

Although every circuit agrees that a child may be removed from her home in order to protect her from abuse, the circuits have not agreed on what burden the government is under to justify such a removal in the absence of a court order. *Compare, e.g.*, *Hatch v. Dep't for Children, Youth and Their Families*, 274 F.3d 12, 21 (1st Cir. 2001) (reasonable suspicion of past abuse can justify warrantless seizure of a child), *with Tenenbaum v. Williams*, 193 F.3d 581, 594-95 (2d Cir. 1999) (requiring reasonable suspicion of imminent abuse). In my view, these decisions have sometimes given inadequate weight to the Fourth Amendment rights of the child.

Taking a child from her home without her consent or the consent of her parents is a seizure. *Maj. Op.* 8. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Under well-established law, in order to justify a warrantless search or seizure in the home "[t]he government has to surmount two hurdles." *United States v. Dawkins*, 17 F.3d 399, 403 (D.C. Cir. 1994). The first hurdle is probable cause; the second hurdle is demonstrating that the "failure to procure a warrant was justifiable in light of circumstantial exigencies," *id.*, and we have directed courts to "weigh the degree of intrusion against the exigency that is its rationale," *United States v. Goree*, 365 F.3d 1086, 1090 (D.C. Cir. 2004).

This two-part inquiry allows us to separate the question whether there was sufficient evidence to justify removing the child from whether there was sufficient evidence to justify *warrantless* removal. *Cf. Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (noting the "heavy burden" faced by the government to justify warrantless searches or arrests). I see no reason to abandon this two-part framework when evaluating the removal of a child from her parents' home.

The intrusion inherent in separating a child from her parents cannot be overstated. In order to justify such an intrusion without a court order, the need for immediate action must be great. I would find that the Fourth Amendment does not permit a government agency to remove a child from her home without a court order unless the agency has a reasonable basis to believe that the delay necessary to obtain the order would endanger the life or health of a child. *Cf., e.g.*, *Missouri v. McNeely*, 133 S. Ct. 1552, 1558-59 (2013) (listing circumstances justifying warrantless entry, such as providing emergency assistance, engaging in hot pursuit of a felon, or putting out a fire); *In re Sealed Case 96-3167*, 153 F.3d 759, 766-67 (D.C. Cir. 1998) (warrantless entry appropriate where burglary in progress); *United States v. Johnson*, 802 F.2d 1459, 1462 (D.C. Cir. 1986) (finding exigent circumstance where evidence may be lost or destroyed if search is delayed). The question is not whether a child may be in danger of future harm in a generic sense; it is instead whether the delay required for seeking even ex parte judicial review could be catastrophic. Otherwise, we risk undermining the Fourth Amendment rights of our children, as well as the "momentum for respect," *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), of the constitutional protection of the "strong tradition of parental concern for the nurture and upbringing of their children," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).