BROWN, Circuit Judge,
dissenting:
As Law and Order reminds us every evening, the police are the ones “who investigate crime.” Nowadays, though, we demand much more from them. The series of unfortunate events presented by Matthew Corrigan’s lawsuit is distressing, and I agree with the conclusion that the second search of Corrigan’s apartment violated the Fourth Amendment. Nevertheless, given the varied role played by police officers, and its effect on the standard Corrigan must meet to pierce the officers’ qualified immunity, I respectfully dissent.
I.

The Varied Role of Police.& the Virtue of Qualified Immunity

“People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.” Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) (per Burger, J.). “[B]y design or default, the police are also expected to reduce the opportunities for the Commission of some crimes ..., aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis.” 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6 (5th ed.).
Maintaining the balance between protecting public safety and safeguarding individual constitutional rights has always been an exacting task. This charge is particularly challenging in our post-9/11 world, where even local police forces are increasingly confronted by sophisticated, well-armed threats, and where active-shooter scenarios are now part of routine training. Viewed in hindsight, Corrigan’s recitation of the facts shows some poor judgment by the police, but we must consider what they knew and when they knew it. Had law enforcement’s initial response been less comprehensive, lives and property might have been lost when an explosion ripped the neighborhood apart, while the condemnations of law enforcement’s lack of initiative would still be reverberating.
It is easy to criticize decisions made with less-than-perfect information in highly *1040 tense, rapidly-evolving situations. This is particularly true when officers are protecting an individual from potential dangers posed to himself or others, rather than serving in an investigatory or crime-fighting function. Accordingly, courts do not consider police conduct in response to “exigent circumstances” in the same way they evaluate police conduct in the context of criminal investigation. See, e.g., Sutterfield v. City of Milwaukee, 751 F.3d 542, 551 (7th Cir. 2014) (“Sutterfield, for example, frequently speaks about the lack of a warrant but has not addressed what type of warrant, if any, would have been appropriate and available in the circumstances confronting the police. Her briefs seem to view the case through the lens of criminal law enforcement when the case plainly does not fit that model.”).
“A myriad of circumstances could fall within the terms ‘exigent circumstances,’ ” and many could be ill-founded. See Wayne, 318 F.2d at 212. “Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of ‘dead bodies,’ the police may find the ‘bodies’ to be common drunks, diabetics in shock, or distressed cardiac patients.” Id. This is why the qualified immunity standard appreciates that “the business of policemen ... is to act, not to speculate or meditate on whether the report is correct.” See id. (emphasis in original). The qualified immunity analysis requires courts to place themselves in the shoes of the law enforcement personnel who confront these volatile' situations, armed with little information and burdened with enormous responsibility.
Properly applied, the qualified immunity analysis shows the officers’ initial actions were not only responsible, but commendable. When the officers’ actions transgressed the Fourth Amendment, Corri-gan's rights were protected by the district court granting his motion to suppress and entering a nolle prosequi on all charges against him. Now, when Corrigan seeks half-a-million dollars in a § 1983 lawsuit, a different issue is in play: whether controlling law was “sufficiently clear that every reasonable official would 'have understood that what [t]he[y] [did] violate[d]” Corrigan’s Fourth Amendment rights. See, e.g., Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (emphasis added). The court concludes it was, but I am at a loss to understand how this holding can be squared with the simple fact that neither the Supreme Court’s precedent, nor ours, nor a robust consensus of our sister circuits clearly answered the legal questions faced by the officers in this case.
There is much on which the majority and I agree. Under the circumstances of this case, the first search was permissible; the second search was not; and the information the police garnered from the first search and further investigation changed the calculus. However, on the question of how these issues impact the scope of qualified immunity, we part company.
First, by imposing an artificially high burden on police conduct in exigent circumstances, the court conflates the “probable cause” normally required to search a person’s home and the “objectively reasonable basis” used to evaluate intrusions based on exigent circumstances. Compare Op. 1030, 1035-36 with Brigham City, Utah v. Stuart, 547 U.S. 398, 402, 407, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (reversing the Utah Supreme Court’s conclusion that probable cause and an inquiry into objective reasonableness were required to assess the justification of warrantless entry on the ground of exigent circumstances, relying solely on an analysis of objective reasonableness) and United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010) (“[T]he standard is more lenient *1041 than the probable cause standard”) and United States v. Snipe, 515 F.3d 947, 952-53 (9th Cir. 2008). This conflation signals the majority opinion’s fundamental flaw: grafting general Fourth Amendment standards from the criminal investigation context on to the exigency context.
Related to this first problem is the second—and more significant—issue with today’s opinion: The metric for measuring what law is “clearly established” is more protean than my colleagues concede;
II.

“Clearly Established” Law

A. The Standard

The standard for law to be “clearly established” is quite demanding. The Supreme Court’s most recent pronouncement on the issue confirms “[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he, is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.” Mullenix v. Luna, — U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (emphasis added). Qualified immunity is “a question of law, not one of legal facts.” Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (emphasis added). Indeed, lower courts are not even under any obligation to address whether a constitutional right has been violated', the court may proceed directly to whether any such right was “clearly established” in law at the time. See Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).[1]

B. The Source

The source of “clearly established” law is quite constrained as well. Controlling precedent from the Supreme Court, the applicable state supreme court, or from the applicable circuit court, constitutes “clearly established” law—but it is unclear what else, if anything, does. See, e.g., Lane v. Franks, — U.S. -, 134 S.Ct. 2369, 2382, 189 L.Ed.2d 312 (2014) (observing that, if two prior Eleventh Circuit cases were still “controlling,” the Court “would agree” the law is clearly established. But, “at best,” there was “only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity”); Stanton v. Sims, — U.S. —, 134 S.Ct. 3, 7, 187 L.Ed.2d 341 (2013) (per curiam) (emphasizing, in finding qualified immunity, that the questioned conduct was “lawful according to the courts in the jurisdiction where [defendants] acted”); Hope v. Pelzer, 536 U.S. 730, 741-42, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing “binding Eleventh Circuit precedent,” along with a State Department corrections regulation and a Justice Department report to hold Alabama prison officials violated clearly established law).
If there is no controlling authority in the plaintiffs jurisdiction at the time of the incident, “a robust consensus of cases of persuasive authority” “is necessary” to show “clearly established” law. al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074 (emphasis added); see also Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (requiring a robust consensus “at a minimum,” absent control *1042 ling authority). This makes sense. It is simply not reasonable to ask police departments around the country to keep abreast of every circuit court’s latest “clearly established” pronouncement and parse its application to the myriad factual permutations officers encounter on a daily basis. Cf. Wilson v. Layne, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (“If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy”). Accordingly, the Supreme Court is circumspect about the use of out-of-circuit cases to compose “clearly established” law. Since al-Kidd, it is only assumed for sake of argument that “a right can be ‘clearly established’ by circuit precedent despite disagreement in the courts of appeals.” See Taylor v. Barkes, — U.S. -, 135 S.Ct. 2042, 2045, 192 L.Ed.2d 78 (2015) (per curiam); City & Cnty. of San Francisco v. Sheehan, — U.S. -, 135 S.Ct. 1765, 1776, 191 L.Ed.2d 856 (2015); Carroll v. Carman, -U.S. -, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014) (per curiam); Reichle v. Howards, — U.S.-, 132 S.Ct. 2088, 2094, 182 L.Ed.2d 985 (2012).[2]

C. The Characterization

Finally, characterizing the appropriate law as “clearly established” is quite exacting. The Supreme Court has “repeatedly told courts ... not to define clearly established law at a high level of generality. Qualified immunity is no immunity at all if ‘clearly established’ law can simply be defined as the right to be free from unreasonable searches and seizures.” Sheehan, 135 S.Ct. at 1775-76. Rather, the law purported as “clearly established” must “provide clear notice” of what the Constitution requires. See, e.g., Lane, 134 S.Ct. at 2382; see also Sheehan, 135 S.Ct. at 1777 (“No matter how carefully a reasonable officer read” the applicable circuit precedents “beforehand, that officer could not know that [the conduct at issue] would violate the Ninth Circuit’s -test”). To be sure, there can be “an obvious case” where a more generalized test of a Fourth Amendment violation “‘clearly establishes]’ the answer, even without a body of relevant case law.” Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). But, that circumstance is inapposite when a case is “one in which the result depends very much on the facts.” See id. at 201, 125 S.Ct. 596. In that latter circumstance, a more “particularized” inquiry into the applicable law is required. See id. at 200, 125 S.Ct. 596. There, we ask whether a prior case “squarely governs the case here,” not whether a prior case puts this one in á “hazy border” between acceptable and unacceptable conduct, see id. at 201, 125 S.Ct. 596. Behavior on the border is still behavior protected by qualified immunity.
III.

The Relevant Law Was Not “Clearly Established” Here

The majority, cites no Supreme Court case and no D.C. Circuit case squarely governing Corrigan’s claim. Indeed, the majority all but concedes there is no such case when justifying its review of both the “constitutional violation” and “clearly established” prongs of the qualified immunity analysis; doing so “to avoid ‘leav[ing] the standards of official conduct permanently in limbo.’ ” Op. 1029 (quoting Camareta v. Greene, 563 U.S. 692, 706, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011)) (alterations *1043 in original).[3] The majority finds “clearly established” law by reasoning the facts of this exigent circumstances case back to the general principles of warrantless home searches in the criminal investigation context. This is inappropriate in Corrigan’s case, where the officers were not searching for criminal activity but responding to a potentially-suicidal suspect'with “military items.” See Sutterfield, 751 F.3d at 563-64 (“But a more fundamental question raised by this case is the relevance of the warrant requirement. Certainly it is logical to consider the availability of a warrant when the police have reason to suspect that criminal activity may be afoot, but what about cases in which the police are not acting in a law enforcement capacity?”). But even if this was appropriate, the majority’s analysis rests on “legal facts,” not law. But see Elder, 510 U.S. at 516, 114 S.Ct. 1019 (“Whether an asserted federal right was clearly established at a particular time ,., presents a question of law, not one of ‘legal facts.’”). The facts aid the analysis, but only to the extent they are closely aligned (or are obviously distinguishable from) controlling authority or persuasive authority. The “clearly established” inquiry is its own question, not a rehash of the facts giving rise to a constitutional-rights violation. Cf. Pearson, 555 U.S. at 236, 129 S.Ct. 808. The factual regurgitation is telling, however, because it confirms Corri-gan’s claim is one where the existence of “clearly established” law “depends very much on the facts of [this] case.” Brosseau, 543 U.S. at 201, 125 S.Ct. 596. “Clearly established” law in this context thus depends upon a prior case “squarely governing]” this one. See id. Since the majority can point to no clearly analogous case prohibiting the officers’ conduct, that should end the inquiry.
The closest case cited, Mora v. City of Gaithersburg, 519 F.3d 216 (4th Cir. 2008), is not binding authority, and it confirms the officers’ conduct fell within the “hazy border” between protected and unprotected conduct. It cannot, therefore, constitute a violation of “clearly established” law. See Brosseau, 543 U.S. at 201, 125 S.Ct. 596. In Mora, the Fourth Circuit held that officers reasonably conducted a warrant-less search of the subject’s bags, car, home, and effects even though he was outside the home and already handcuffed at the time. 519 F.3d at 226-27. Exigent circumstances existed in Mora because Maryland police had received a call from a healthcare hotline operator who said she had spoken to Mora; he told her he was suicidal,' had weapons in his apartment, could understand shooting people at work, and he “might as well die at work.” See id. at 220. Police promptly contacted a coworker' who confirmed' Mora’s threats shóiild be taken seriously. Id. Eleven minutes after the operator’s call, Mora was handcuffed and on the ground. Id. Without seeking a warrant, officers searched his vehicle and luggage, entered and searched his apartment, and opened two safes and multiple interior doors. The officers discovered multiple handguns and rifles, ammunition, and gun accessories. Id.
The Fourth Circuit rejected Mora’s § 1983 suit claiming the searches violated *1044 the Fourth Amendment. The court emphasized “protecting the physical security of its people is the first job of any government” and the threat of mass murder “implicates that interest in the most compelling way.” Id, at 223. Given the issues at stake, the Fourth Circuit attempted to articulate a “framework for analyzing the constitutionality of preventive action” that is instructive here. See id. at 222.
Mora recognized “[preventive actions raise somewhat different' constitutional questions than the typical backwards-looking criminal investigation or immediate police response to a crime already in motion. When the threat is [as] extreme and the need to prevent it [is] as great as with potential mass murder, the constitutional questions take on a special urgency and a certain novelty.” Id. While “[t]he likelihood or probability that a crime will come to pass plays a role in other prevention-oriented cases,” id. at 224, “so do two other factors,” id.—namely, “how quickly the threatened crime might take place” and “the gravity of the potential crime.” Id. “As the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action. In circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventative action is needed to defuse it.” Id. at 224-25.
Here, as the district court said, the police were faced with “an admittedly unstable individual who had called a suicide hotline, admitted to having firearms, lied to investigators about his whereabouts, and was known to possess unknown military items.” JA 634. Corrigan’s neighbor had seen him previously host overnight guests, the police had spoken to Corrigan’s ex-girlfriend on the phone but lacked a visual confirmation of her location, and the police smelled gas coming from his building upon their arrival. The police were also informed Corrigan had IED training. Like Mora, Corrigan’s intentions on the phone were “ambiguous to be sure.” See 519 F.3d at 226. But the Fourth Circuit did not simply say officers had some justification to “rush[ ] immediately into Mora’s home and tak[e] him into custody”—it said the officers had “overwhelming justification.” See id. (emphasis added). Here, the officers admittedly had less-than-overwhelming justification for their initial search, but Corrigan’s phone call and the corroborating information the officers learned provided ample justification for their initial search. Moreover,' Mora was a case that implicated the criminal activity of mass murder, bringing that case closer to the more general Fourth Amendment rules of criminal investigation than Corrigan’s case, which falls squarely into the exigency camp. Given the Fourth Circuit’s analysis, if a sufficiently imminent and grave threat could justify a comprehensive warrantless search after the suicidal suspect’s apprehension, an officer in a full-blown barricade situation could reasonably believe similarly expansive powers may be exercised lawfully here. Perhaps most importantly, the majority can cite to no case from the Supreme Court, our circuit, or “a robust consensus of cases of persuasive authority” requiring a contrary conclusion. See Plumhoff, 134 S.Ct. at 2023; see also Doe v. District of Columbia, 796 F.3d 96, 105 (D.C. Cir. 2015) (“Given the uncertainty regarding when exactly an exigency exists and the lack of our own controlling precedent, the law in question was not ‘clearly established’ at the time.”).[4]
*1045 To be sure, the facts here provide some contrast to Mom. In the initial sweep of Corrigan’s home, police did not find any dangerous or illegal items in plain view, or incendiary written materials, or locked doors. Interviews with neighbors who seem to know him well were reassuring rather than alarming. His upstairs neighbor explained Corrigan’s unresponsiveness was probably the result of having taken his medication; he was likely sleeping. She dismissed the news that Corrigan was suicidal as “outrageous” and told officers there must, be “a big misunderstanding” because, in two years of contact with Cor-rigan, she had “never felt more comfortable” with a neighbor. Thus, just as facts learned about Mora gave officers reason to ratchet up preventive actions, the investigation into Corrigan’s background favored de-escalation.
Nevertheless, the majority fails to appreciate the three crucial imports from Mora:
First, the case gives officers a rational basis to conclude that they may, under the right circumstances, conduct a warrantless search of a suicidal suspect’s residence even after the suspect has been apprehended. But see Op. 1031-32. This is what occurred here, where Lt. Glover sent the EOD into Corrigan’s apartment to search for any hazardous materials that could pose a threat to others—though the officers were uncertain about what they máy finid and their intuitions were unfounded.
Second, when deciding to execute subsequent searches in the exigency context, the officers can “take into account the nature of the threat that led to their presence at the scene!’ Mora, 519 F.3d at 228 (emphasis added). In other words, the initial justification for a warrantless search can continue to play a role in how an officer proceeds when subsequently “uncovering the threat’s scope.” See id. at 226; see also Sutterfield, 751 F.3d at 567-68. Just so here, where, as Lt. Glover said, if the officers left it to Corrigan’s landlady to return upstairs without quelling the initial concerns about a gas leak and possible military equipment, the police would be responsible for the consequences. For this reason, much of the majority’s hand-wringing about the officers’ failure to obtain a warrant for the second search is beside the point. The officers here were responding to an exigent circumstance involving a suicide suspect with IED training in the middle of the night; they were not investigating a crime. Cf. United States v. Hendrix, 595 F.2d 883, 886 (D.C. Cir. 1979) (“Because of the early hour, it would have taken at least a few hours to obtain a warrant, during which period appellant, who had been arrested merely for disorderly conduct, likely would have been able to secure his release, return home, and conceal or use the shotgun again.”). A reasonable officer might conclude that “the mere passage of time without apparent incident” is insufficient to alleviate the initial concerns giving rise to the exigency. See Sutterfield, 751 F.3d at 562.
Third, in both Mora’s case and Corri-gan’s, the malleable legal standard to determine the scope of the exigency they faced (that, in turn, determines the scope *1046 of an acceptable search) was crafted in hindsight—it could not be deemed “clearly established” at the time'the officers took action, yet it must be in order to defeat qualified immunity. At the time—with no Supreme Court or D.C. Circuit case squarely governing the emergency situation faced here—a reasonable officer could read Mora, Sutterfield, and Hendrix and conclude that. the warrantless searches conducted in Corrigan’s apartment might be within the realm of the officer’s authority to abate public safety concerns posed by possession of military equipment by an individual with. IED training. This is so .even as the second search was a “substantial step beyond the standard protective sweep.” See Sutterfield, 751 F.3d at, 577.
Unlike the general principles of Fourth Amendment law the majority recites from the criminal investigation context, “courts have not spelled out a definition of ‘exigency’ with any precision.” See United States v. Dawkins, 17 F.3d 399, 405 (D.C. Cir. 1994); see also Sutterfield, 751 F.3d at 553 n.5 (recognizing “the lack of clarity in judicial articulation and application” of the exigent circumstance doctrines). But determining whether the law was “clearly established” is not an exercise in Monday-morning quarterbacking—law enforcement officers should not be subject to personal liability simply because the judiciary has not precisely defined the rules of the road. See Pitt v. District of Columbia, 491 F.3d 494, 512 (D.C. Cir. 2007) (“Although [the conduct can constitute a violation of the Fourth Amendment], the district court correctly held that the three defendant officers are entitled to qualified immunity on these claims because this right ivas not ‘clearly established’ at the time of the actions at issue in this case.”) (emphasis added). It is therefore insufficient to apply, retrospectively, criminal investigation limitations on police conduct to the exigent circumstances context simply because these limitations have long existed in the investigatory context.
Ultimately, the court’s analysis rests On the “Fourth Amendment standard” of reasonableness. See Op. 1037. The “inquiry” of “objective reasonableness” as to a Fourth Amendment violation, however, “is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation.” See Heien v. North Carolina, — U.S. -, 135 S.Ct. 530, 539, 190 L.Ed.2d 475 (2014). The fact that the officers violated the Fourth Amendment in searching Corri-gan’s apartment a second time without a warrant is, for purposes of finding the “particular” issue faced by the officers answered by “clearly established” law, a non sequitur. What “every reasonable” official would have understood to be “cldarly established” 'in case law is not the same question as what is “objectively reasonable” for purposes of determining a Fourth Amendment violation. See Heien, 135 S.Ct. at 539-40; cf. Pearson, 555 U.S. at 236, 129 S.Ct. 808 (holding that lower courts are under no obligation to consider both the issue of a constitutional-rights violation and the separate question of whether the right was clearly established). Moreover, the fact-based analysis of what law was “clearly established” here—spanning roughly six pages of the majority’s opinion, see Op. 1035-38 precludes the majority from credibly resting the “clearly established” question on a “basic principle of Fourth Amendment law,” see id. at 1037. It does not take six pages to explain why law is “clearly established” unless the case is “one in which the result depends very much on the facts.” Brosseau, 543 U.S. at 199, 201, 125 S.Ct. 596. Identifying.“some tests [from cases] to guide us in determining the law' in many different kinds of circumstances” is not the same as articulating “the kind of clear law (clear an *1047 swers) that would apply with such obvious clarity to the circumstances of this case that only an incompetent officer or one intending to violate the law could possibly fail to know....” Pace v. Capobianco, 283 F.3d 1275, 1283 (11th Cir. 2002) (emphasis added). But the majority will not—and indeed, cannot—admit this. If-the majority did admit this, it would then have to concede no case “squarely governed” at the time the officers entered Corrigan’s apartment.
IV.
We do not need to make “bad law” just because “bad facts” are often accused of doing so. There is much to regret about the procedures police continued to pursue here—especially in light of the many observations and revelations which objectively decreased the imminence of'any dire threat. Good intentions, however, are no substitute for good reasons. “Because of the importance of qualified immunity to society as a whole, the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability.” Sheehan, 135 S.Ct. at 1774 n.3. Indeed, if this decision were affirmed by the Supreme Court .on the ground that the officers violated clearly established law, it would mark the first time in more than a decade that the Supreme Court has ruled in favor of a § 198S plaintiff on the question. See Groh v. Ramirez, 540 U.S. 551, 565, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004); Hope, 536 U.S. at 745-46, 122 S.Ct. 2508. Yet the Supreme Court’s exacting standard to identify “clearly established” law does not play even a supporting role in the court’s analysis, which, at most, strings together generalized statements and some out-of-eircuit cases, affixes the label “clearly established” onto the newfangled “rule” drawn from them, and then employs this “rule” to deny qualified immunity. If we want to join the game of second-guessing first responders, we will find ourselves at the end of a long queue. But flouting the •clear trend of controlling authority is both unwarranted and unwise, so I respectfully dissent.

. Even so, I agree with the court’s conclusion that the officers did violate Corrigan’s Fourth Amendment rights during their second, intrusive search into his apartment. See Pearson, 555 U.S. at 236, 129 S.Ct. 808 (explaining “it is often beneficial" to analyze both issues, even as there is no requirement to do so).

. Indeed, two circuits go even further—totally excluding persuasive authority from other jurisdictions when determining what is "clearly established.” See Pabon v. Wright, 459 F.3d 241, 255 (2d Cir, 2006); Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 955 (11th Cir. 2003).

. Camreta is illuminating towards the nature of qualified immunity and the "clearly established” standard. The discussion surrounding this quotation confirms the “clearly established” standard is akin to the "first bite rule” in torts. In other words, unless and until "[cjourts ... clarify uncertain questions, ... address novel claims ... [and] give guidance to officials about how to comply with legal requirements,” qualified immunity is appropriate. See Camreta, 563 U.S, at 706, 131 S.Ct. 2020. Accordingly, while I take no issue with the majority deciding today to define the scope of exigent circumstances in a warrant-less home search during a barricade situation on a go-forward basis, applying.it retroactively is another matter altogether.

. As the majority admits, nothing in our existing precedent determines the community-caretaking doctrine's contours in a home intrusion, see Op. 1034-35, but the court then ‘‘assum[es] without deciding” it applies here and it nevertheless has "clearly established” contours, see id. at 1034-35. I fail to see how: *1045 (1) conceding there is no controlling authority; (2) assuming without deciding there is applicable authority by reading the tea leaves from “some circuits”; and then (3) concluding that these cases constitute a "robust consensus” at the time the officers entered Corri-gan's apartment places the “constitutional question” over the community-caretaking doctrine’s contours in the home “beyond debate.” See Mullenix, 136 S.Ct. at 308; cf. Wilson, 526 U.S. at 617-18, 119 S.Ct. 1692 (characterizing a circuit split on the relevant issue as "undeveloped,” meaning "the officers in this case cannot have been expected to predict the future course of constitutional law”).